Matter of Jacob L. v Heather L. (2024 NY Slip Op 51780(U))

[*1]

Matter of Jacob L. v Heather L.

2024 NY Slip Op 51780(U)

Decided on August 15, 2024

Family Court, Tompkins County

Miller, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on August 15, 2024
Family Court, Tompkins County

In the Matter of a Custody Proceeding 
 Under Article 6 of the Family Court Act Jacob L., Petitioner,

against
Heather L., Respondent.

Docket No. XXXXX

Petitioner, pro se
Attorney for Respondent, Emerson Mitchell, Esq. Attorney for the Child, Lucy Gold, Esq.

Scott A. Miller, J.

Petitioner Jacob L. (hereinafter "the father") and Heather L. (hereinafter "the mother") are the parents of the subject child, born in 2020. This Family Court is very familiar with the parties as they have been engaged in nearly continuous and highly acrimonious family court litigation before this Court since late December 2020.
Before analyzing the father's current modification petition, this Court's previous findings must be noted.
At a prior evidentiary hearing held on May 26, 2021, on the issue of whether supervision was required during the father's parenting time, the Court determined that the mother was entirely credible and clearly had been the primary caregiver to the child. Additionally, the Court found that the father was wholly lacking in credibility and misrepresented both to the Court and CARS (Cayuga Addiction Recovery Services) the extent of his alcohol abuse and dependence. The mother convincingly established through receipts and photographic evidence that the father [*2]consumed approximately twenty-one (21) 1.75-liter bottles of vodka from October 2, 2020, through December 19, 2020. The mother credibly and convincingly established that the father was drunk six to seven nights each week and he would begin drinking at 5pm or 6pm and remain in the garage and continue to drink until he passed out. The May 26, 2021 hearing also convincingly established that, when intoxicated, the father was verbally and physically abusive towards the mother, refused to lock away guns that were in the household, and would pick up and carry the child, causing the mother, understandably, to fear for their daughter's physical safety. On at least one occasion, the father left the oven burner on all night after having cooked in a late night drunken fog. The mother was forced to vacate the marital home on December 23, 2020 because of the father's alcohol fueled threatening behaviors.
At the May 26, 2021 evidentiary hearing when asked by the attorney for the child if he would "commit to absolutely no alcohol under any circumstances ever," in order to see his daughter, the father answered, "Yes."
On September 1, 2021, the day the final evidentiary hearing was to begin on the parties' initial Article 6 and 8 petitions, the parties, at all times represented by counsel, entered into an Article 6 consent Order under which the mother was granted sole legal custody and primary placement of the child. The father was granted supervised visitation at his parents' home. Additionally, the consent Order provided a pathway for the father to follow in order to progress from supervised visitation to unsupervised and eventually overnight visitation with their child. Under the terms of the consent Order, in order to progress towards unsupervised and overnight visitation, the father was, inter alia, required to engage with and successfully complete treatment for alcohol dependence, remain abstinent from alcohol, and be subject to periodic and random screens for alcohol. Additionally, under the terms of the consent agreement, all pending Article 8 petitions were dismissed and a non-harassing Order of Protection in favor of the mother and the child was issued against the father under the Article 6 proceeding.
The parties' divorce was finalized by Tompkins County Supreme Court Judgment of Divorce entered on April 29, 2022.
On May 16, 2022, the father filed his first Article 6 modification petition, and sought, inter alia, unsupervised parenting time with the child and right of first refusal to care for the child instead of the daycare chosen by the mother. The father averred that since the September 1, 2022 Order he had "completed and been successfully discharged from alcohol treatment," and "ha[d] undergone every requested alcohol test" without a "single positive test." (Petition at par. 5.) The father also objected to the mother's enrollment of the child at the IC3 daycare due to cost and also because the father asserted he was now in a position to watch the child because of a change in his work schedule. The mother opposed the father's requested relief, upon the grounds that the father's modification petition both (1) was premature and (2) failed to articulate that the mother had violated their consent Order by enrolling the child in daycare. However, while the father's modification petition remained pending, the parties nonetheless agreed to cooperate in order to come up with an unsupervised visitation schedule which would commence on the previously agreed upon and ordered date of June 30, 2022. The attorney for the child, at that time, based upon the father's apparent sobriety, agreed that it was time for the child to have unsupervised parenting time with the father. The Court entered an Interim Visitation Order on June 29, 2022, which provided the father with twice weekly unsupervised visitation with his child. Apparently, from June 30, 2022, through August 25, 2022, the unsupervised visits proceeded without incident.
On August 25, 2022 the mother filed an Emergency Order to Show Cause seeking suspension of the father's visitation with the daughter and extension of the Order of Protection, based upon the father having allegedly consumed alcohol on August 23, 2022, at the Dryden VFW, such conduct being in contravention of the abstinence requirements of the September 1, 2021 consent Order. The mother attached a video exhibit showing the father drinking some type of alcoholic beverage at the bar at the Dryden VFW during the evening of August 23, 2022.
The Court granted the mother's requests, entering an Order temporarily suspending the [*3]father's visitation with the child in its entirety and also extending the Order of Protection. The father filed his opposition to the mother's Emergency Order to Show Cause on September 1, 2022, and affirmed that, "There is nothing in the video exhibit or anywhere else in [the mother's] affidavit that would prove I was drinking or consuming an alcoholic beverage." (Father's August 31, 2022 affidavit).
At a November 7, 2022 evidentiary hearing, limited to the issue of the father's alleged alcohol consumption on the mother's Emergency Order to Show Cause, counsel for the father attempted to retreat from the father's August 31, 2022 affidavit, arguing that the father "didn't deny that he had an alcoholic drink in the affidavit, Your Honor. He maintained he was sober, and we also contested whether or not, I did, that the video constituted actual proof of anything without any kind of, you know foundation. That's what we said. We said he didn't have a drink, so that's been misconstrued." (November 7, 2022 transcript at 11.) At this evidentiary hearing, the father, confronted not only with the video evidence of him drinking at the VFW, but the affidavit of VFW manager, admitted he had in fact consumed an alcoholic beverage on August 23rd as the mother had alleged. Nonetheless, the father argued that the consent Order doesn't mean what it in fact expressly states, and he asserted that the alcohol prohibition "sounds like while the child is in my care." (T. at 16). The Court emphatically reminded the father that the clear unambiguous terms of the consent Order require the father to remain totally abstinent at all times regardless of whether the child is in his care. The father, throughout the entire hearing never once simply admitted he had had a setback, made a mistake, but rather, he became more irate throughout the proceeding to the point that the Court was required to take a brief recess in order for the father to collect himself. As the Court has noted (T. at 23), the father's verbal gymnastics with respect to whether there existed proof of his alcohol consumption at the VFW was an obvious effort to mislead the Court.
This Court found that the father's continued alcohol consumption in violation of the parties' consent order and his prevarication before the Court demonstrated that he could not establish any sufficient change in circumstance that would warrant the Family Court in engaging in a best interests analysis. The Court consequently dismissed the father's Article 6 modification petition finding that no further evidentiary hearing was warranted. This Court held:
The father's continued alcohol consumption and prevarication before the Court demonstrates that he cannot establish any sufficient change in circumstance that would warrant the Family Court in engaging in a best interests analysis. In fact, the father's modification petition has resulted in evidence to the father's detriment, i.e., continue alcohol consumption and deception before the Court. (Family Court's December 5, 2022 Supplemental Decision and Order).
Consequently, this Court dismissed the father's modification petition without further hearing. The father appealed this dismissal to the Appellate Division, Third Department, and on June 27, 2024, the Third Department reversed this Family Court's decision holding that it was error for this Court to limit the evidentiary hearing solely to whether the father had willfully violated the 2021 consent order by consuming alcohol, and this court should have held a full fact-finding since the "father asserted in his petition that his work schedule had changed, which the mother conceded to be true, indicating that they had to alter his parenting time to accommodate his new work schedule. Based upon this, the father had demonstrated a change in circumstances warranting inquiry into whether a change in the custody or parenting time arrangement was in the best interests of the child." Jacob L. v. Heather L., 228 AD3d 1191 (3rd Dept. 2024).
On April 15, 2024, while the father's appeal was still pending, this Court did conduct a full change of circumstances evidentiary hearing on the father's latest modification petition filed on September 25, 2023. As noted, The Third Department's recent decision in this matter was decided on June 27, 2024, just three days after the father's final post-hearing submission, which was dated and filed June 24, 2024. Consequently, this Family Court has carefully considered the cautionary admonitions of the Third Department and incorporated such before issuing this latest [*4]decision.
The father alleged in his September 25, 2023 modification petition brought by Order to Show Cause, that the mother was placing their child at risk because she was intoxicated on several occasions in August and September 2023 while at local family restaurant, Crossroads, while the child was with her. The father is seeking a change of legal custody, primary placement, and supervised visitation for the mother. The father also noted concerning diaper rashes and bruising on the child's eye. The mother filed an affidavit in opposition on September 29, 2024, denying that she was ever intoxicated at Crossroads. The mother affirmed that she does not drink alcohol every time she goes to Crossroads, and she further affirmed that at most when she is with the child, she only has a single alcoholic drink (vodka and tonic) and has never been in an intoxicated condition when at Crossroads restaurant with the child. The mother also disputed the father's suggestions that the child suffered unusual diaper rash and she further answered that the father's claim that the child suffered an eye injury was more "fabrication" by the father (Mother's Sept. 29 aff. at par. 22). The mother further averred in her affidavit, "At no point in any of these videos was I intoxicated. As Jacob states, our custody order clearly says that he may not consume any alcohol at any time, and I may not abuse alcohol while [the child] is in my care. I have not done that, do not do that, and will not do that." (Mother's Sept. 29 aff. at par. 35). The mother further answered that, "I have sworn under oath that [the father] told me while we were together that he joined Q-Anon. The morning I left him, he spouted conspiracy theories about how the "higher-ups" are going to kidnap [our child], "make her a breeder, rape her, hurt her and suck the adrenaline out of the soft spot in her head so they can be young" *** Jacob's own filing of the Writ of Quo Warranto, which included many buzzwords of the sovereign citizen movement and their lack of willingness to admit that laws apply to them, including Jacob's repeated statement that he is a "freeman with blood flowing through his veins," among other non-sensical statements as to jurisdiction, led to further concerns which were properly taken seriously by the Attorney for the Child and this Court.[FN1]
My ongoing concern over Jacob's mental health is shown through his continued denials of these facts." (Mother's Sept. 29 aff. at par. 37). The mother further averred that, "[the child] is safe, happy, and thriving in my care. Jacob has recently enjoyed expanded parenting time, following the timeline and requirements set forth in the Custody Order and Supplemental Order of this Court. There is no reason to upend the forward progress that is being made here due to baseless allegations and Jacob's harassing campaign against me." (Mother's Sept. 29 aff. at par. 38).
The Court searched the statewide registry of orders of protection, the Sex Offender Registry, and the Family Court's child protective records, and has notified the parties and the attorneys of the results of these searches.
 FINDINGS OF FACT
On April 15, 2024, a full fact-finding on the father's modification petition was held. The father appeared pro se. The mother appeared and was represented by Emerson Mitchell, Esq. The child was represented by Lucy Gold, Esq. The court heard testimony from the mother, the father, and A. M. Various exhibits, including photographs and videos, were also received into evidence. The fact-finding was not limited merely to the father's allegations in his latest modification petition, but the parties were also permitted to testify concerning a wide variety of issues, not limited to but including the child's schooling, the parties' current work schedules, the parties' relationship with alcohol, proposed changes to the existing parenting schedule each party believed was suitable for the child, as well as the current status of the parents' ability to communicate concerning their child.
Most significantly, the father's primary allegation that the mother was intoxicated on one or more occasions during August/September 2023 at the Crossroads restaurant while with the child was wholly lacking in any credible proof. The father called A.M., his current girlfriend, who admitted that she went to Crossroads at the behest of the father to essentially spy on the mother on at least one occasion. The Court found the mother entirely credible that on occasion she goes to Crossroads (which is not a bar, but a family restaurant) with the child and she either refrains from drinking alcohol or has at most a single alcoholic drink. Significantly, the father's girlfriend, A.M., never testified that she observed the mother in an intoxicated condition while at the Crossroads restaurant with the child. A.M. further conceded that she did not contact law enforcement but, she did stay in real-time contact with the father. It was clear from her testimony that A.M.'s goal was simply to collect evidence for the father and there was no sincere concern that the child was in any danger. Further, although A.M.'s previous affidavit relied heavily on hearsay statements from other individuals at Crossroads, the father failed to call anyone else to testify.
The Court has carefully reviewed the surreptitious video recordings (Exhibits 4 ,5 and 6) recorded by the father's girlfriend, and as the mother testified, and as this Court agrees, the videos do NOT depict in any way that the mother demonstrated any signs of impairment or intoxication. The mother appears perfectly coordinated and furthermore her driving away from the restaurant is careful, coordinated, and controlled. The Court found the mother entirely credible when she testified that she was not intoxicated at Crossroads while with her child on any of the alleged occasions, nor at any other time that she was at the restaurant with her child. In short, the father failed to prove any of his allegations that the mother was intoxicated while with the child.
Furthermore, this Court finds that the father's allegations amount to continued gaslighting by the father, who still refuses to acknowledge the extent of his alcohol abuse problem which led to the parties entering into the Sept. 1, 2021 consent order, whereby the father agreed to remain abstinent from alcohol. Under that consent order, the mother was never required to remain abstinent from alcohol, only the father. The Court also finds that the father's use of his girlfriend to surreptitiously spy upon and video record the mother was wholly inappropriate and the mother is justified in her continued fear and concern. The father is cautioned against engaging in this further course of conduct and alarming behavior which could amount to a family offense (i.e., Harassment in the Second Degree [Penal Law §240.26] and Stalking in the Fourth Degree [Penal Law §120.45]).
The Court is also gravely concerned that notwithstanding the father's previous history of extreme alcohol abuse, and the fact that the father agreed to enter into an abstinence-based alcohol abuse treatment program (Sept. 1, 2021 consent order), the father, at the April 15, 2024 fact-finding, failed to call his treatment counselor or offer any treatment records into evidence. The father admitted during cross-examination that he did not see any reason to disclose his alcohol use to his counselor. Although the father stated that he participates in a 12-step program, he further stated that, at present, his engagement in it had "stalled." To date, this Court still has not been provided with any confirmation that the father has engaged in an appropriate alcohol abuse treatment program.
On the issue of alleged extreme diaper rashes and bruising, again there is nothing here to see. The father failed to provide any proof that the child suffered from anything other than ordinary diaper rash or common childhood bangs and bruises, or as the mother credibly explained, an irritated bug bite. The Court fully credits the mother's testimony on these points.
The mother credibly testified that she has been the child's primary caregiver since birth and she is deeply involved with all aspects of the child's life including home life, socialization with peers, medical care, and schooling. The mother credibly testified that her employment provides an optimal situation for her care of the child during non IC3 daycare hours. The mother works from her home, has flexible hours, and can provide her child with one-on-one attention during those periods of time. The mother does not require an outside childcare provider, nor [*5]would she need to depend on aging grandparents for the child's care. Further, the mother's employment allows for international trips where she is able to take the child with her and provide the child with valuable experiences that clearly enrich her life.
The mother credibly testified that IC3 daycare has been a wonderful learning and socialization environment for the child and that she has thrived in the program. The attorney for the child at all times has supported the mother's placement of the child in this daycare program. Moving forward, the mother has confirmed that the child has been accepted into the Lansing public school pre-K program and as such will no longer attend IC3, which consequently means the father will no longer incur a child support obligation for daycare.
By contrast, throughout the father's testimony, he demonstrated hostility towards the IC3 daycare program, showed no interest in getting to know any of the child's IC3 teachers, and showed no interest in arranging play dates for the child and her IC3 friends when the child was in his care. The father had sparse contact with the child's teachers (only during his pickups), had no information about her program activities, and clearly had no interest in finding out. It was clear to this Court that the father felt nothing but contempt for his child's IC3 daycare program, and his main objection was the fact that he was required to pay his proportional share for this program. The father appeared quite put off with having to cover a portion of the child's daycare expenses at IC3. The father testified that he saw no benefit to the child's attendance in daycare. The father showed no awareness as to the importance of the child's socialization with other children her age. He further conceded that during his parenting time, he had never invited any of her friends from IC3 to come to his house or other locations for play dates. The father was generally unsupportive of any endeavor that he did not personally endorse. Furthermore, the father has little knowledge of the child's medical care, has had little or no contact with her medical providers, and struggled to remember the child's primary doctor.
The father conceded that in the mother's efforts to work with the father, she had made their child available for additional vacation visits out of state. The father further conceded that in terms of additional weekly parenting time, he had never requested any additional time. When asked why, the father simply stated, "I work." It is also noteworthy that although the father had a weekly option for Monday and Wednesday afternoons, he never exercised that option.
In a shocking exchange during the fact-finding, the father displayed his continued hostility and antipathy towards the mother when he accused her of forging his signature on passport application documents for their daughter for a trip to Switzerland. The father's accusation is baseless, as this Court takes judicial notice that a parent with a sole legal custody order need not obtain consent from the non-custodial parent in order to obtain a passport for a child.
The father, in his final written submissions, requests sole legal custody and equal parenting time for him and the mother. The mother, through counsel, in her final written submission, requests continued sole custody and primary placement, continued overnight weekend visitation as reflected in the November 30th interim order, or, in the alternative, adjusting the father's schedule to a standard alternating Friday to Sunday schedule while maintaining all regulatory aspects of the father's use of alcohol. The attorney for the child, in her final submission argues that the father failed to prove a significant change of circumstances, but she supports the father having continued weekly Friday to Saturday overnights with the child as well as expanded time on Thursdays until 7:00 p.m., with the parties to share major holidays.

CONCLUSIONS OF LAW
A "party seeking to modify an existing custodial arrangement" must "demonstrate, as a threshold, that 'there has been a change in circumstances since the prior custody order significant enough to warrant a review of the issue of custody to ensure the continued best interests of the children' (Matter of Tyrel v. Tyrel, 132 AD3d 1026, 1026 [2015] [internal quotation marks and citations omitted]; see Matter of Gerber v. Gerber, 133 AD3d 1133, 1135 [2015])." Matter of [*6]Harrell v. Fox, 137 AD3d 1352, 1354 (3rd Dept. 2016). If the petitioner meets that burden, he or she must then demonstrate that the "best interests of the child[ren] would be served by modification of that order (Matter of David ZZ. v. Suzanne A., 152 AD3d 880, 881, 58 N.Y.S.3d 711 [2017] [internal quotation marks and citations omitted]; accord Matter of Heather U. v. Janice V., 160 AD3d 1149, 1150, 74 N.Y.S.3d 410 [2018] )." Beers v. Beers, 163 AD3d 1197, 1198 (3rd Dept. 2018). "Any court in considering questions of child custody must make every effort to determine 'what is for the best interest of the child, and what will best promote [his or her] welfare and happiness' [internal citations omitted]." Eschbach v. Eschbach, 56 NY2d 167, 171 (NY 1982). "In determining the best interests of a child, a court must consider various factors, including 'the parents' ability to provide a stable home environment for the child, the child's wishes, the parents' past performance, relative fitness, ability to guide and provide for the child's overall well-being, and the willingness of each parent to foster a relationship with the other parent' [internal citations omitted]." Herrera v. Pena-Herrera, 146 AD3d 1034, 1035 (3rd Dept. 2017).
Further, the courts have held that where there is an "acrimonious relationship" and poor communication between the parties, joint custody is inappropriate. See Shearer v. Spisak, 90 AD3d 1346, 1347 (3rd Dept. 2011); Tylaeya C. v. Karl S., 187 AD3d 402 (1st Dept. 2020). In such cases, it is appropriate to award sole custody to the parent who has been the "primary caregiver" to the [children] and to the parent who has "demonstrated a willingness to foster a relationship between the [children] and [the other parent] " Keen v. Stephens, 114 AD3d 1029, 1031 (3rd Dept. 2014); Tylaeya C. v. Karl S., 187 AD3d 402 (1st Dept. 2020). In considering a party's willingness to promote a relationship between the children and the other parent, the court may take into account the party's poor communication with the other parent, "disparaging treatment," and "failure to take responsibility for his [or her] actions." Cameron ZZ. V. Ashton B., 183 AD3d 1076 (3rd Dept. 2020).
Based upon all of the evidence, while the Court has found that circumstances have changed enough to warrant a change in the father's parenting time schedule, it still remains in the child's best interests that the mother continue to be awarded sole legal custody. There remains an "acrimonious relationship" between the parties such that joint custody is wholly inappropriate. The father still refuses to acknowledge his responsibility in creating the family discord. The father's anger toward the mother and anyone of authority remained on palpable display throughout the current proceedings. The mother, justifiably, continues to be afraid of the father. None of the father's allegations against the mother in his latest filing were supported by actual credible evidence. Through the father's own witness, his current girlfriend, A.M., it was established that the father requested that she secretly record the mother.
As the primary caregiver to the child since the start of these proceedings, the mother has provided a stable home environment for her. The mother unambiguously demonstrated to this Court that she is the parent best suited to make decisions for the child. The father continues to harbor irrational hostility towards the mother. The father set his current girlfriend on a surreptitious surveillance operation against the mother, which yielded nought. The father had nothing but contempt for the child's enriching IC3 daycare program. The father continues to object to court- ordered child support as such is only, as he expressed, for "dead-beat" fathers. The father even accused the mother of forging his name on a passport application. The father, at this time, through no fault of the mother, is simply unable to co-parent with her. It remains abundantly clear that there is no basis to modify the mother's continued award of sole legal custody. The Court finds that it remains in the child's best interest that the mother continues to have sole legal custody.
In spite of the father's failure to prove any of his allegations against the mother in his latest filing, and notwithstanding the fact that the father inappropriately utilized his girlfriend to spy upon the mother, the Court finds that circumstances have changed significantly enough since the entry of the parties' September 1, 2021 consent order, that a modification and expansion of the father's parenting time with the child is warranted.
By the time of the April 15, 2024 fact-finding, the mother and father had been operating under a new interim order, dated November 30, 2023. Under this interim order, the father is no longer required to remain abstinent from alcohol, but only is only required to refrain from alcohol consumption during his parenting time with the child. Additionally, the father was granted Friday to Saturday weekly overnights with their child as well as additional daytime parenting time during the week. Furthermore, at the commencement of the April 15th fact-finding, counsel for the mother conceded, and the Court agreed, that the removal of the abstinence requirement and the expanded overnight parenting time being exercised under the November 30th interim order amounted to a change of circumstance. This Court further finds that the father's changed work schedule since entry of the September 1, 2021 consent order as well as the mother's acknowledgment, even in the face of the father's continued hostility towards her, that although she is "certain" joint-custody is not workable with the father, and there remain "challenges with co-parenting," she, in a magnanimous display stated, that they are "getting along better when communicating by text" constitutes a change in circumstances. The mother clearly loves and is devoted to her child. The Court did not detect that she harbors any animosity towards the father, and although she is unsettled by his anti-government views, and at times feels harassed by his behavior (such as sending his girlfriend to secretly record her), she nonetheless is genuine in her desire to foster the child's relationship with her father.
Additionally, as this Court previously noted, the Third Department, while not overturning any of this Family Court's previous credibility and factual determinations, has reversed this Court's dismissal of the father's earlier modification petition (as well as an award of attorney's fees). The Third Department's cautions to this trial court presents an additional changed circumstance, when considered with the above-discussed other changes, requiring that this court modify the parenting schedule in the best interests of the child. Although this Court is as troubled as the mother and the attorney for the child that the father failed to present any testimonial or documentary evidence concerning what type of alcohol abuse treatment plan he has engaged in since the parties' September 1, 2021 consent Order, this trial court understands that it has been cautioned from "directing that the father completely abstain from the consumption of alcohol or dictating the specific type of treatment method the father must utilize beyond what is necessary to protect the child during his parenting time." Jacob L. v. Heather L., 228 AD3d 1191 (3rd Dept. 2024). Consequently, the Court cannot direct either parent to completely abstain from alcohol.
The father's Friday overnight visitation with the child has proceeded without incident since the end of November 2023. The attorney for the child supports continuing the Friday overnights, but suggests expanding to Thursdays from after school until 7:00 p.m. The mother is not opposed to alternate weekends Friday through Sunday but requests that the Court regulate the father's alcohol use when he is caring for the child. As such it is hereby:
ORDERED, that the mother shall continue to have sole legal custody and primary placement of the subject child; and it is further
ORDERED, that the father shall have visitation with the child, such visitation shall be overnight parenting time with the child on alternating weekends from Friday at 5:00 p.m. if school is not in session, or Friday immediately after school if school (or pre-K) is in session, father to pick up child from school, until Sunday at 5:00 p.m.; and it is further
ORDERED, that Easter, Halloween, Thanksgiving Day, Christmas Eve, Christmas Day, and the child's birthday shall be shared equally between the parties on an alternating basis; and it is further
ORDERED, that the mother shall have the child every Mother's Day, and the father shall have the child every Father's Day; and it is further
ORDERED, that the father shall have full, complete, and independent access to the medical and educational records and providers of the subject child which shall include the right to attend medical appointments and any extracurricular activities of the child; and it is further
ORDERED that neither party shall disparage the other or speak of any past or pending [*7]court matters to the child, and each has an affirmative duty to ensure that other individuals do not disparage the other parent or speak of any past or pending court matters to the child; and it is further
ORDERED that exchanges for parenting time shall take place at the home of the paternal grandparents or at the child's school unless the parties agree to another arrangement, and it is further
ORDERED that the visitation terms of this agreement may be modified as the parties agree in writing, taking into consideration the best interests of the child, and it is further
ORDERED, that in regulating their own behavior, the parties shall follow the "rights of a child whose parents are separated (adapted from the Parent's Handbook of the New York State Parent Education and Awareness Program — 2016):
1. The right not to be asked to "choose sides" between their parents.
2. The right not to be told any details of the legal proceedings going on between their parents.
3. The right not to be told "bad things" about the other parent's personality or character.
4. The right to privacy when talking to the other parent on the telephone.
5. The right not to be interrogated by one parent about the other parent.
6. The right not to be asked to carry messages between parents.
7. The right not to be asked by one parent to tell the other parent untruths.
8. The right not to be used as a confidant regarding adult matters.
9. The right to express feelings, whatever those feelings may be.
10. The right to choose not to express certain feelings.
11. The right to be protected from parental "warfare."
12. The right not to be made to feel guilty for loving both parents.
Enter: August 15, 2024
Ithaca, New York
Hon. Scott A. Miller
Tompkins County Family Court Judge

Footnotes

Footnote 1: The Court takes judicial notice of the mother's May 19, 2023 Order to Show Cause, in which the mother attached the father's filings from their child support litigation, in which the father expressed nonsensical sovereign citizen notions.